ORIGINAL

FILED
NOV 2 8 2007
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| INTERNATIONAL MANAGEMENT SERVICES, INC. | |
| Plaintiff, | 07-831 C |
| v. | CFC No. ________ |
| THE UNITED STATES | Judge____________ |
| Defendant. | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIONS

Submitted by:

Richard D. Lieberman
McCarthy, Sweeney & Harkaway, PC
2175 K St., NW, Suite 600
Washington, DC 20037
Tel: 202-775-5560
Fax: 202-775-5574
Counsel to Plaintiff, International Management Services, Inc.

November 28, 2007

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii-v

I. QUESTION PRESENTED ........ 1

II. STATEMENT OF THE CASE ........ 2

III. FACTUAL BACKGROUND ........ 4

IV. STANDARD OF REVIEW ........ 10

V. ARGUMENT

A. In Violation of FAR 19.501 and the Small Business Act, The Army Failed To Consider or Raise the Question of Aegis's Ostensible Subcontractor, Even Though the Contracting Officer Was Fully Aware of This Issue ........ 11

B. In Violation of 13 C.F.R. § 121.1009, FAR 19.501 and the Small Business Act, 15 U.S.C. § 644, SBA Failed To Raise or Consider Aegis's Ostensible Subcontractor, Even Though the SBA Knew or Should Have Known This Was A Significant Issue In This Procurement ........ 14

C. Army Unlawfully Made Award To Other Than a Small Business In Violation of FAR 19.501 And The Small Business Act ........ 17

D. The Award To Aegis Was Clearly Prejudicial ........ 17

E. Standards For Injunctive Relief And Relief Requested ........ 18

1. IMS Will Suffer Immediate and Irreparable Injury if the Court Does Not Grant the Requested Injunctive Relief ........ 19

2. It is Likely That IMS Will Succeed on the Merits in This Litigation ........ 19

3. The Harm to IMS Far Outweighs the Harm to the Government or Any Third Party ........ 20

4. It is in the Public's Interest to Grant the Injunction ........ 20

VI. CONCLUSION ........ 21

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Banknote Corp., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004)....10

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)....11

*Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859 (Fed. Cir. 1987)....21

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996)....17

*Essex Electro Engineers, Inc. v. United States*, 3 Cl. Ct. 277 (1983)....19, 20

*Federal Management Systems v. United States*, 61 Fed. Cl. 364 (2004)....10

*Isratex, Inc. v. United States*, 25 Cl. Ct. 223 (1992)....19, 20

*Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952 (Fed. Cir. 1984)....18

*Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373 (1992)....18, 19, 20

*Marawais Steel Co. v. Department of the Air Force*, 871 F. Supp. 1448 (D.D.C. 1994)....12, 13

*Quality Transport Serv., Inc. v. United States*, 12 Cl. Ct. 276 (1987)....19

*TRW Environmental Safety Sys. v. United States*, 16 Cl. Ct. 520 (1989)....21

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed. Cir. 1983)....18

**Page(s)**

**ADMINISTRATIVE DECISIONS (INCLUDING GAO)**

*Asee Servs. Corp.*, SBA No. 4250 (1997) ........ 15, 16

*Geo-Marine, Inc. & Melendez-Donnell & Assocs.*, SBA No. 3459 (1991) ........ 16

*Good Food Service, Inc.* B-253161, August 19, 1993 1993 WL 325125 ........ 11

*Keco Industries, Inc.*, B-188385 August 9, 1977 77-2 CPD ¶ 98 ........ 12, 13

Size Determination No. 1-SD-2007-27, 28, March 2, 2007 ........ 3, 8, 9, 14, 16, 17

Size Determination No. 4-2007-3, October 26, 2007 ........ 3, 10, 14

Size Determination No. 2-2007-28, 29 & 30, January 8, 2007 ........ 8

Size Determination No. 4-2008-4, November 2, 2007 ........ 10, 16

**STATUTES**

5 U.S.C. § 706(2)(A) ........ 10

15 U.S.C. § 644 ........ 11, 14, 15

28 U.S.C. § 1491(b)(4) ........ 10

**REGULATIONS**

13 C.F.R. § 121.103(h)(4) ........ 3, 8

13 C.F.R. § 121.1001(a)(1)(iv) ........ 10

13 C.F.R. § 121.1004(a)(1) ........ 10

13 C.F.R. § 121.1004(b) ........ 12

13 C.F.R. § 121.1009 ........ 14, 15, 17

**Page(s)**

13 C.F.R. § 121.1009(b) ....................................................................................15

FAR 19.501 ..............................................................................................11, 14, 15, 17

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| INTERNATIONAL MANAGEMENT SERVICES, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | CFC No. ________ |
| THE UNITED STATES | ) | Judge___________ |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIONS**

**COMES NOW** Plaintiff International Management Services, Inc. ("IMS") by and through undersigned counsel, and hereby files this Memorandum of Points and Authorities in Support of its Motion for Preliminary and Permanent Injunctions.

## I. QUESTION PRESENTED

Should the Court of Federal Claims grant injunctive and declaratory relief, declaring the award of a contract pursuant to Solicitation No. W911W4-05-R-0006 (the "RFP" or "Solicitation") to Aegis Mission Essential Personnel, LLC ("Aegis") by the U.S. Army Intelligence and Security Command ("INSCOM" or "Army"), to have been made in violation of statute and regulation, and in an irrational manner, and require that award of that contract be made in accordance with law and regulation after full and open

competition?

## II. STATEMENT OF THE CASE

The Army's RFP was issued as a total small business set aside for management services necessary to recruit and deploy in Afghanistan more than 1600 skilled contract linguists (including those with Secret, Top Secret and Sensitive Compartmented Information clearances) with at least nine different foreign language capabilities, in support of the Army and all other U.S. Government commands and agencies executing Operation Enduring Freedom ("OEF"). RFP at 2. After a series of size protests and resulting size determinations issued by the U.S. Small Business Administration ("SBA"), it should have become apparent to the Army and the SBA that no small business was capable of performing the work specified in the RFP because of the complexity of the requirement and the need for one or more large business subcontractors to perform the vital and necessary parts of the contract as an "ostensible subcontractor."[1]

Notwithstanding the fact that it should have been clear to the Army and SBA that any small business submitting an offer on this subcontract would need to rely on an

---

[1] The use of large business subcontractors for vital and primary parts of the contract makes the offeror "not a small business" pursuant to the ostensible subcontractor rule in the SBA regulations, which states: "[a] contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is

ostensible subcontractor, neither the Army nor SBA even considered the fact that its awardee, Aegis, expected to rely on its ostensible subcontractor, Science Applications International Corporation ("SAIC"), a large business with $8.3 billion in revenues in fiscal year 2007, and similar multi-billion dollar revenues in prior years.[2] Furthermore, it is believed that SyColeman, a subsidiary of L-3 Communications ("L-3"), is another a multi-billion dollar corporation which has agreed to act as a subcontractor to Aegis, and would likely be another ostensible subcontractor.

Aegis is a relatively inexperienced linguist contractor which to date has performed only a small number of linguist contracts overseas. On information and belief, Aegis does not have the resources or capabilities to manage a contract of the size contemplated by the RFP. It is apparent that the primary and vital requirements of the Army contract must be performed by SAIC and perhaps L-3.

Notwithstanding these facts regarding Aegis and its ostensible subcontractor, which were known to the Army and to the SBA through a series of small business protests submitted by IMS,[3] neither the Contracting Officer nor the SBA ever considered the question of Aegis's ostensible subcontractor in making Aegis's size determination,

---

the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation." 13 C.F.R. § 121.103(h)(4)).

[2] M2 Presswire, SAIC Announces Financial Results for 4th Quarter and Fiscal Year 2007, April 12, 2007. Available at http://goliath.ecnext.com/coms2/gi_0199-6430793/SAIC-Announces-Financial-Results-for.html.

[3] IMS's size protest of Aegis's ostensible subcontractor was dismissed in SBA Size Determination Case No. 4-2007-3, October 26, 2007 because SBA asserted that IMS lacked standing. (This protest was submitted to the Contracting Officer pursuant to SBA rules, and then forwarded to the SBA). Previously, the SBA had addressed the ostensible subcontractor issue in connection with IMS's size in the March 2, 2007 Size Determination 1-SD-2007-27, 28, two protests that were also submitted to the Contracting Officer and forwarded to the SBA.

wherein the SBA found Aegis "small." As a result, SBA conducted an incomplete size determination, permitting the Army to make award to Aegis. However, any reasonable analysis of Aegis's proposed performance would indicate it is not small because of its ostensible subcontractor. Indeed, IMS believes that there is no small business that can perform the work in the RFP without what the SBA would consider an ostensible subcontractor.

Accordingly, because the Army awarded this total small-business set-aside solicitation to a business that is other than small, Plaintiff urges the Court to order the cessation of all performance under Aegis's contract (including any task orders). Plaintiff also requests that the Court order the Army to resolicit this requirement using full and open competition, because the competition conducted pursuant to the RFP indicates that there is no small business capable of performing the contract.

## III. FACTUAL BACKGROUND

### A. The RFP

On June 30, 2006, INSCOM issued solicitation No. W911W4-05-R-0006 for U.S. Army Linguist Translation and Interpretation Support for Operation Enduring Freedom in Afghanistan ("Solicitation" or "RFP"). The RFP was 100 percent set aside for small business using North American Industry Classification System ("NAICS") code 54190 (Translation and Interpretation Services), with a size standard of $6.5 million. See Combined Synopsis and Solicitation for W911W4-05-R-0006 posted June 30, 2006 on www.fedbizopps.gov. The RFP was to result in an Indefinite Delivery, Indefinite Quantity ("IDIQ"), task order contract. RFP at 3. The minimum order under the resulting

IDIQ contract was $10 million and the maximum of all orders was $703 million. RFP at 4.

The RFP's Statement of Work provided:

> [F]oreign language interpretation and translation services in support of the United Army, its Unified Commands (USEUCOM, USCENTCOM, USOUTHCOM, USNORTHCOM, USPACOM), attached forces, combined forces and joint elements who are executing the military mission known as OEF-A [Operation Enduring Freedom-Afghanistan] and other U.S. Government agencies who are supporting the OEF-A mission.... Linguist services are required to permit our forces to communicate effectively with the local populace, gather information for force protection, and interact with foreign military units. Since these operations do not have predefined or predictable work locations, hours, or duration, the contractor shall provide interpretation and translation services as required by the supported forces up to 24 hours per day, 7 days per week for all operations. Linguists shall be at the specified site for a minimum of 8 hours per day, and may be extended for up to 12 hours, and on call for the remaining 12 hours, depending on mission requirements. Contractor personnel will be required to live and work in harsh and hostile environments, and remain in the operations area for as long as is required.

RFP at 2.

The Program Management Section of the RFP provided:

> The contractor shall be responsible for the execution of the contract from Order execution through Recruitment, Deployment (to include CONUS [Continental United States] Replacement Center (CRC) processing), Quick Reaction Capability (QRC) tasks, On-Site Management, and Quality Control (inclusive of the complete range of supporting administrative, budgetary, security, and logistical tasks inherent in this function).

RFP at 8.

The RFP requires the contractor to provide three categories of linguists, CATs I, II, and III. CAT I linguists need possess no security clearance, however CAT II linguists must possess a SECRET clearance and CAT III linguists must be U.S. citizens who either possess a TOP SECRET Security Clearance with access to Sensitive Compartmented Information ("TS/SCI"), or who, at a minimum, possess an interim TS clearance with interim access to SCI. RFP at 11-12.

The RFP estimated that the work in the resulting contract would require 1691 people, 1688 of which would be located in Afghanistan. Furthermore, 198 of these personnel would require Secret or Top Secret/SCI clearances, as shown in the following Chart which was included as Attachment 4 of the RFP.

**ATTACHMENT 4**
**STAFFING CHART-CONTRACT LEVEL [Operation Enduring Freedom-Afghanistan]**

**Geographic [Level of Effort]**

| **LOCATION** | **CATEGORY** | | | **TOTAL** |
|---|---|---|---|---|
| | **I** | **II** | **III** | |
| Afghanistan | 1493 | 167 | 28 | 1688 |
| CONUS | | | 3 | 3 |
| **TOTAL** | **1493** | **167** | **31** | **1691** |

**[Specified Contract Required Languages Level of Effort]**

| **LOCATION** | **CATEGORY** | | | **TOTAL** |
|---|---|---|---|---|
| | **I** | **II** | **III** | |
| Arabic-Modern Standard (AD) | | 1 | 3 | 4 |
| Arabic-Egyptian (AE) | | 1 | | 1 |
| Persian-Afghan (Dari) (PG) * | 710 | 13 | 1 | 724 |
| Pashto (PU) | 253 | 13 | 3 | 269 |
| Pashto / Dari (PU/PG) ** | 530 | 125 | 18 | 673 |

| | | | | |
|---|---|---|---|---|
| Pashto - Nurestani | | 2 | 2 | 4 |
| Pashto - Pashayi | | 5 | 2 | 7 |
| Pashto - Wasiri | | 5 | 2 | 7 |
| Urdu (UR)* | | | 2 | 2 |
| **TOTAL** | **1493** | **167** | **31** | **1691** |

* Four (4) must be female, CONUS-hired, who are either U.S. Citizens or U.S. legal residents.
** Thirty (30) must hold citizenship or lawful permanent residency in the United States, United Kingdom, Canada, Australia, New Zealand or a member state of the European Union [Note: Languages listed above that utilize a slash instead of a dash (i.e., Pashto/Dari) require the translator to be skilled in both languages and capable of translating between the identified languages, as well as from the identified languages into English.]

RFP at 143.

All things considered, the RFP required that the winning contractor have considerable management experience, be able to provide nearly 1700 personnel overseas in Afghanistan, be able to recruit and deploy (including processing at a CONUS Replacement Center) these personnel from Order execution through recruitment, quick reaction capability, on-site management, and quality assurance (including the complete range of supporting administrative, budgetary, security, and logistical tasks). This is an extremely complex statement of work, particularly in view of the fact that it is essentially being performed in a wartime theater of operations, where lives may be dependent upon satisfactory performance.

B. Submission of Offers, Awards and Protests

On or about August 13, 2006, offerors submitted proposals in response to the RFP. On information and belief, the Army considered four contractors who submitted offers to be qualified to perform the requirement, and placed these four in the competitive

range, namely, IMS, Aegis Mission Essential Personnel, LLC ("Aegis"), Torres Advanced Enterprise Solutions, LLC ("Torres") and Thomas Computer Solutions, LLC ("TCS").

On or about December 15, 2006, after negotiations were completed, the Army awarded a contract to TCS. On December 20, 2006, IMS, Aegis and Torres filed size protests with the Army Contracting Officer ("CO") asserting that TCS was not small and on January 8, 2007, the Small Business Administration ("SBA") issued Size Determination Nos.2-2007-28, 29 & 30 finding TCS to be other than small because its average annual receipts exceeded $6.5 million.

After receipt of the above size determination, the Army rescinded the contract award to TCS, and made award to IMS. On February 6, 2007, Torres filed a size protest with the contracting officer asserting that IMS was not a small business because of its affiliation with WorldWide Language Resources, Inc. ("WWLR"), which is other than a small business, and its undue reliance on WWLR under the ostensible subcontractor rule.[4] On February 7, 2007, Aegis filed a size protest with the contracting officer also asserting that IMS was not a small business because of, inter alia, its undue reliance on WWLR under the ostensible subcontractor rule.

On March 2, 2007, the SBA issued Size Determination Nos. 1-SD-2007-27 and 28, finding IMS other than small because it had one or more ostensible subcontractors and because it was affiliated with WWLR. The March 2, 2007 SBA size determination explicitly noted that "SBA also notes that with a size standard of $6.5 million, it is not surprising that a small business would be forced to rely heavily on its larger

[4] See note 1, supra, which discusses SBA's ostensible subcontractor rule at 13 C.F.R. § 121.103(h)(4)).

subcontractors." 1-SD-2007-27, 28 at 6. This should have been a clear warning to both the Army and the other offerors on this procurement that it was unlikely that a small business could perform the RFP requirements without an ostensible subcontractor.

On or about September 21, 2007, the Army made award to Aegis pursuant to the RFP. On September 27, 2007, IMS submitted a size protest to the Army Contracting Officer asserting that Aegis was other than small because it exceeds the relevant receipts standard and because Science Applications International Corporation ("SAIC"), a large business, was affiliated with Aegis as its ostensible subcontractor. In this same size protest submitted to the Contracting Officer, on September 27, 2007, IMS submitted a size protest of Torres, asserting that it was other than small because, inter alia, because L-3 Communications ("L-3"), a large business, was affiliated with Torres as its ostensible subcontractor.

On October 3, 2007 and again on October 9, 2007, Torres filed protests at the Government Accountability Office concerning the RFP. Plaintiff does not know the basis of either of those protests. The GAO docketed them as B-299315.4 & B-299315.5, respectively.

On October 18, 2007 Torres filed a size protest against Aegis, asserting that Aegis was other than small because its average annual receipts exceeded the relevant receipts standards and because Aegis was affiliated with several additional entities based solely upon the appearance of the name of Aegis's Chief Executive Officer in Ohio Secretary of State records. *Torres's size protest apparently said nothing about Aegis's ostensible subcontractor.*

On October 26, 2007, in Size Determination Case No. 4-2007-3, the SBA dismissed IMS's size protest of Aegis without mentioning the protest of Torres, asserting that IMS lacked standing under the provisions of 13 C.F.R. § 121.1004(a)(1) and 13 C.F.R. §121.1001(a)(1)(iv). On November 2, 2007, the SBA issued Size Determination No. 4-2008-4, and found Aegis to be a small business under the RFP's size standard. This size determination does not consider the question of SAIC or any other contractor as an "ostensible subcontractor."

On November 9, 2007, the GAO dismissed protests B-299315.4 and B-299315.5. Plaintiff does not know the basis of those dismissals, but it believes that Torres withdrew both of them.

## IV. STANDARD OF REVIEW

The applicable standard of review in bid protests is that an agency's procurement decision will not be disturbed unless it is shown to be "arbitrary, capricious and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), 28 U.S.C. § 1491(b)(4). A bid protest may challenge two possible improper actions: the rationality of the substance of the agency's decision and the procedures mandated by regulation for conduct of the procurement. Fed. Mgmt. Sys. v. United States, 61 Fed. Cl. 364, 366 (2004) (citing Banknote Corp., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).

In order to establish a violation of regulation or procedure, the disappointed bidder must demonstrate a "clear and prejudicial violation of applicable statutes or regulations." Id.

While the decision of the procuring agency is entitled to a presumption of regularity, that presumption does not shield the agency from a "thorough, probing, in-depth review." See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).

## V. ARGUMENT

### A. IN VIOLATION OF FAR 19.501 AND THE SMALL BUSINESS ACT, THE ARMY FAILED TO CONSIDER OR RAISE THE QUESTION OF AEGIS'S OSTENSIBLE SUBCONTRACTOR, EVEN THOUGH THE CONTRACTING OFFICER WAS FULLY AWARE OF THIS ISSUE

The purpose of the Small Business Act with respect to government acquisitions is to ensure that a fair proportion of all government contracts be placed with small business concerns. 15 U.S.C. § 644. In order to implement this requirement, FAR 19.501 states that the "purpose of small business set-asides is to award certain acquisitions exclusively to small business concerns."[5] The Army attempted to set aside the RFP for small business, but failed to recognize (using readily available information) that its award to Aegis was made to a large business, in violation of FAR 19.501 and the Small Business Act.

It must be recognized that a Contracting Officer may protest the size status of an offeror at any time during a procurement. The SBA size rules state that contracting officers "may file protests before or after awards [except if made before bid opening or

[5] The provisions of FAR Subpart 19.5 were issued to "implement the Small Business Act requirement that a 'fair proportion' of government contracts be placed with small business concerns." Good Food Service, Inc., B-253161, August 19, 1993, 1993 WL 325125.

notification to offerors of the winner]. 13 C.F.R. § 121.1004(b). Therefore, a contracting officer may protest the size status of an offeror whenever there is reason to believe that the offeror is other than small.

The GAO and the U.S. District Court for the District of Columbia have acknowledged a duty and obligation on the part of a Contracting Officer to challenge an offeror where the CO has information that would reasonably impeach the small self-certification of the offeror. In Keco Industries, Inc., B-188385, Aug. 9, 1977, 77-2 CPD ¶ 98 at *4, the GAO noted that although a Contracting Officer may accept a small business size self-certification and forego submission of a CO's size protest, a "contracting officer's action or inaction must be measured against a standard of reasonableness in the particular case." In Keco, the CO had information that indicated a large business had a security interest in substantially all of the small awardee's assets, including contract rights, which would likely have made the offeror other than small. The GAO concluded that "the clear intent of the regulation is that, if information is brought to the attention of a contracting officer which reasonably would impeach the self-certification of a bidder, the contracting officer must file a direct protest with the SBA in order to assure that the self-certification process is not being abused." Id. (emphasis added).

In Marawais Steel Co. v. Dept. of the Air Force, 871 F. Supp. 1448 (D.D.C. 1994), the court distinguished Keco, limiting the CO's duty to file his own size protest. The court noted that in Keco, "no disappointed bidder had filed a preaward size protest. Therefore the contract was awarded without an SBA review of the successful bidder's self certification. To remedy this situation, the Comptroller General required only that the contracting officer file a size protest, and did not require that particular information be

forwarded to the SBA." 871 F. Supp. at 1453. In Marwais, a disappointed bidder had filed a preaward protest, and "SBA therefore had an opportunity to use its powers of inquiry and acquire necessary information about [the awardee]. The complete absence of review of self-certification that existed in Keco does not exist here. The SBA may have been less than thorough in soliciting information about [the awardee], but the Air Force did not violate any duty set forth by the Comptroller General, since it did not need to play the role of protester of last resort required by the facts in Keco." Id.

Essentially, Marwais limits the CO's duty to initiate a CO protest only to circumstances where:

- the particular issue has not been protested by another offeror; and
- there is no review whatsoever of the issue known to the CO that might make the offeror other than small.

Marwais and Keco are directly applicable and indicate that the CO had an obligation to submit a protest of Aegis's ostensible subcontractor. The CO knew well that SAIC was a potential ostensible subcontractor to Aegis. Indeed, the CO had forwarded IMS's ostensible subcontractor protest of Aegis to the SBA, so he was well aware of the issue. The SBA dismissed the IMS protest on procedural grounds and therefore the issue of Aegis's ostensible subcontractor was never properly before the SBA for consideration or evaluation. Further, since the CO had received Torres's size protest of Aegis, the CO knew that this protest never raised the issue of ostensible subcontractor. This meant that the matter was not before the SBA (i.e. there was a "complete absence" of review of Aegis's ostensible subcontractor, unless the CO were to raise it by submitting a CO protest), and the CO was obligated to bring it SBA's attention. Further, the CO was in the

best position to know that SAIC was an ostensible subcontractor, since the CO's evaluation of Aegis's proposal considered both Aegis's past performance (it was an evaluation factor in the RFP at 91), as well as the significant work that SAIC was slated to perform in the proposal. (Plaintiff has never seen or reviewed the Aegis proposal. However, it believes that it would be impossible for Aegis to perform the work in the RFP without an ostensible subcontractor such as SAIC).

In conclusion, the Army CO failed to raise the question of Aegis's ostensible subcontractor even though he knew of this issue from his review of Aegis's proposal, he was aware of the ostensible subcontractor rule from the prior size determination of IMS (No. 1-SD-2007-27, 28),[6] and the CO also knew (through IMS's dismissed size protest No. 4-2007-3, October 6. 2007, which was submitted to the CO) that SAIC as an ostensible subcontractor was a significant issue. Yet the CO never submitted his own size protest on this particular issue, knowing that Aegis's size protest did not raise the matter. This is a violation of FAR 19.501 and the Small Business Act, and undermines the purpose of small business set-asides.

**B. IN VIOLATION OF 13 C.F.R. § 121.1009, FAR 19.501 AND THE SMALL BUSINESS ACT, 15 U.S.C. § 644, THE SBA FAILED TO RAISE OR CONSIDER AEGIS'S OSTENSIBLE SUBCONTRACTOR EVEN THOUGH THE SBA KNEW OR SHOULD HAVE KNOWN THAT THIS WAS A SIGNIFICANT ISSUE IN THIS PROCUREMENT**

The SBA has an obligation to raise issues it knows or should know during the consideration of a size protest/size determination. By failing to consider Aegis's

[6] The CO also knew that SBA considered the subcontractors a significant issue, because in the IMS Size Determination it stated "that with a size standard of $6.5 million it is not surprising that a small business would be forced to rely heavily on its larger subcontractors." 1-SD-2007-27, 28 at 6.

ostensible subcontractor (SAIC), the SBA violated the SBA size rules (13 C.F.R. 121.1009), the Small Business Act, 15 U.S.C. § 644, and FAR 19.501.

With respect to size determinations, the SBA regulations state as follows:

> Basis for determination. The size determination will be based primarily on the information supplied by the protester or entity requesting the size determination and that provided by the concern whose size status is at issue. *The determination, however, may also be based on grounds not raised in the protest or request for size determination.* SBA may use other information and may make requests for additional information to the protestor, the concern whose size status is at issue and any alleged affiliates, or other parties.

13 C.F.R. § 121.1009(b) (emphasis added). The SBA's Office of Hearings and Appeals ("OHA"), which is the appellate forum for size protests, has interpreted these rules to impose a legal obligation on the SBA to conduct a wide ranging investigation that goes beyond the mere size protest. Indeed, in Asee Servs. Corp., SBA No. 4250 (1997), the OHA considered whether an SBA Area Office's size inquiry and determination was limited to the issues raised by the size protest which initiated it. OHA answered strongly that it was not, and stated as follows:

> Moreover, contrary to appellant's argument, the scope of an Area Office size investigation and determination is not limited to the issues raised in the protest that gives rise to it. [citation omitted]. Although a size determination will be based primarily on information supplied by the protestor (13 C.F. R. § 121.1009(b)), the Area Office may base its size determination on other grounds; it may use other information; and it **may conduct a wide-ranging investigation based upon facts it develops whenever reliable information suggests a challenged firm is not small. Indeed, it has a legal obligation to do so.**

Id. (emphasis added). Asee explicitly rejects the view that an Area Office of the SBA

lacks authority to raise, sua sponte, an issue outside of the written protest. Asee stated "[w]hile the Contracting Officer did not specifically request the Area Office to address the question of Appellant's compliance [with the 50 percent limitation on subcontracting rule], and the procurement did not contain the limitations-on-subcontracting clause, the Area Office correctly addressed this issue." Id.; see also, Geo-Marine, Inc. & Menendez-Donnell & Assocs., SBA No. 3459 (1991) ("scope of a Regional Office size investigation and determination is not determined nor delimited by the scope of the protest that gave rise to it...once the protest or request for a formal size determination is found to be sufficiently specific, such size determination may be based on other grounds not raised in the protest/request.")

The SBA knew well that the ostensible subcontractor rule was a critical aspect of the Army's procurement in this RFP. Indeed, in conducting the size determination of IMS and considering this issue, the SBA had specifically stated that "SBA also notes that with a size standard of $6.5 million, it is not surprising that a small business would be forced to rely heavily on its larger subcontractors." 1-SD-2007-27, 28 at 6. Yet, when it considered the Torres size protest of Aegis, the SBA *never even inquired as to whether Aegis had an ostensible subcontractor, and never discussed possible ostensible subcontractors in the size determination of Aegis.* Size Determination No. 4-2008-4, Nov. 2, 2007.

The SBA failed its obligation to conduct a "wide-ranging investigation" based upon the facts it developed whenever reliable information suggested a challenged firm was not small. SBA knew about the ostensible subcontractor issue from the IMS size protest, yet when it considered the protest of Aegis's size, SBA never even addressed this

issue. This is a violation of the Small Business Act, FAR 19.501, 13 C.F.R. § 121.1009, and the OHA mandated requirement that an Area Office conduct a size determination based on information other than what was included in the protest, where the facts so warrant.

### C. ARMY UNLAWFULLY MADE AWARD TO OTHER THAN A SMALL BUSINESS IN VIOLATION OF FAR 19.501 AND THE SMALL BUSINESS ACT.

The requirements that a small business set-aside RFP be awarded to a small business have been previously discussed in this memorandum. By failing to comply with statutory and regulatory requirements, the Army awarded the contact to Aegis, which is other than a small business because of its ostensible subcontractor, SAIC.

### D. THE AWARD TO AEGIS WAS CLEARLY PREJUDICIAL

A protester must show that the Government's errors were prejudicial. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). In the instant case, the Army awarded the contract to Aegis, despite the fact that it had an ostensible subcontractor. Had the Army ignored the ostensible subcontractor issue entirely, IMS would have retained the contract award that the Army had made to it prior to the award to Aegis.[7] It is clear from the facts that there is no small business capable of performing the work in the RFP because of the ostensible subcontractor rule, which affects all offerors. Accordingly, IMS can properly bring this protest, and request, as it does, that the

procurement be recompeted on a "full and open" basis, where it will stand on the same basis as Aegis and Torres.

## E. STANDARDS FOR INJUNCTIVE RELIEF AND RELIEF REQUESTED

IMS's case meets each of the injunction factors applied by the U.S. Court of Appeals for the Federal Circuit. IMS has a high likelihood of success on the merits of its claims, and it will suffer irreparable injury in the absence of the requested injunctive relief. Moreover, an injunction will serve the public interest, without harming the Army. Therefore, IMS is entitled to a preliminary injunction prohibiting the Army from permitting Aegis to perform the contract or any task orders awarded pursuant to the RFP.

In considering a motion for a preliminary injunction, this Court applies the following four criteria:

(a) Will the Plaintiff suffer a specific, irreparable injury if the procurement action is not enjoined?

(b) Will the Plaintiff likely prevail on the merits of its claim?

(c) The harm suffered by the Plaintiff, if the proposed action is not enjoined, outweighs the harm to the Government and third parties?

(d) Will the granting of the injunctive relief serve the public interest?

See Litton Sys., Inc. v. Sundstrand Corp., 750 F.2d 952, 955 (Fed. Cir. 1984); Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983); Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1378 (1992). In determining IMS's entitlement to

[7] The award to IMS was withdrawn, and award made to Aegis, only after the SBA determined that IMS was "other than small" in Size Determination SD-2007-27,28, March 2, 2007.

this relief, the Court of Federal Claims requires that IMS prove its case by a preponderance of the evidence. See Isratex, Inc. v. United States, 25 Cl. Ct. 223, 228 (1992); Quality Transport Serv., Inc. v. United States, 12 Cl. Ct. 276, 281 (1987).

**1. IMS Will Suffer Immediate and Irreparable Injury if the Court Does Not Grant the Requested Injunctive Relief.**

IMS will suffer irreparable injury if it is denied injunctive relief because it will lose a contract that could be as large as $703 million to an offeror (Aegis) that did not comply with the small business requirements of the RFP.

The denial of an opportunity for a contractor to compete on a procurement and to have its proposal fairly considered in accordance with the FAR is irreparable injury. See Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992) ("[the] [d]enial of the opportunity to obtain the present contract and profits derived therefrom . . . is an irreparable injury") (citing Quality Transp. Servs. v. United States, 12 Cl. Ct. 276, 282 (1987); Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983)).

Clearly, the loss of this RFP, which represents a significant amount of IMS's future business, represents an immediate and substantial harm to IMS.

The violations of regulation in this case have denied IMS an opportunity to compete in a fair and open procurement process. Loss of this contract is likely to cause the bankruptcy and dissolution of IMS. Thus, injunctive relief is proper.

**2. It is Likely that IMS Will Succeed on the Merits in This Litigation.**

As noted above, IMS's arguments with regard to violations of the FAR and the

RFP are clear, and IMS has a substantial likelihood of success on the merits.

### 3. The Harm to IMS Far Outweighs the Harm to the Government or any Third Party.

The balance of harm clearly favors IMS. The potential harm to IMS is substantial loss of future business. There is no harm to the Government since it can easily obtain these services from its present Afghanistan contractor (L-3). There is no harm to Aegis, since, on information and belief, no task orders have been issued yet.

The Government benefits most from a fair and rational procurement procedure that ensures that only small businesses are awarded contracts set aside for small business. Awarding a contract to Aegis, which is other than small because of its ostensible subcontractor, undermines the purpose of small business set-asides and distorts the procurement system. IMS will suffer fatal harm if it is unreasonably denied fair and honest consideration in this competition. See Magnavox, 26 Cl. Ct. at 1384 (citing Isratex, Inc. v. United States, 25 Cl. Ct. 223, 231 (1992)). The damage that the public will suffer, unless the integrity of the procurement process (including small business set-asides) is preserved, is substantial.

### 4. It is in the Public's Interest to Grant the Injunction

The public's interest lies in the Government's ability to maintain faith in a fair and reasonable procurement process, and to ensure that only small businesses receive awards where the procurement is set aside for a small business. Furthermore, granting of the requested relief would merely maintain the status quo since L-3 is currently performing the required services and can continue to perform them during the pendency of any

injunction. The Court has stated that in a bid protest situation, like the one here, injunctive relief is appropriate "to secure the status quo, until a more penetrating look can be had as to the propriety of certain activities during the procurement process--the very purpose of a preliminary injunction…." TRW Envtl. Safety Sys. v. United States, 16 Cl. Ct. 520, 530 (1989) (citing Cordis Corp. v. Medtronic, Inc., 835 F.2d 859, 863 (Fed. Cir. 1987)).

## VI. CONCLUSION

For all of the above reasons, IMS respectfully requests that this Court grant injunctive and declaratory relief, prevent the Army from proceeding with Aegis's contract, and require the Army to recompete the RFP using full and open competition.

DATE: November 28, 2007

Respectfully submitted,

Richard D. Lieberman

Richard D. Lieberman
McCarthy, Sweeney & Harkaway, PC
2175 K St., NW, Suite 600
Washington, DC 20037
Tel: 202-775-5560
Fax: 202-775-5574
rlieberman@mshpc.com

Counsel to Plaintiff, International Management Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy ofthis Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary and Permanent Injunctions to be served on this 28th day of November 2007, by electronic means on the following:

David D'Alessandris, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division, Room 12126
1100 L St, N.W.
Washington, DC 20530
Phone: 202-307-0139
Fax: 202-514-8624
david.d'alessandris@usdoj.gov

Laurel A. Hockey
Cohen and Mohr, LLP
Counsel to Aegis Mission Essential Personnel, LLC
1055 Thomas Jefferson Street, NW, Suite 504
Washington, DC 20007
Phone: 202-342-2500
Fax: 202-342-6147
lhockey@cohenmorh.com

John Isgrigg, III
Contracting Officer
USA INSCOM
8825 Beulah Street
Fort Belvoir, VA 22060
Phone: 703-428-4565
Fax: 703-428-4914
john.isgriggiii@us.army.mil

Richard D. Lieberman